UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X

THOMAS FLANAGAN, RUSSELL THOMPSON,  **DOCKET NO.: CV-21-7153**
SARAH MOFFATT, KYLE GRANT and CHRISTINE
FLANAGAN,

Plaintiffs,

-*against*-

**COMPLAINT**

GIRL SCOUTS OF SUFFOLK COUNTY, INC., PAMELA
MASTROTA, EMILY BROWN, TAMMY SEVERINO,
DONNA SMELAND, JACQUELINE GORDON,
DAWN LOTT, SARAH MCCANDLESS, BRANDY
SCOTT and JENNIFER FRIEDMAN,

Defendants.  **JURY TRIAL DEMANDED**

-------------------------------------------------------------------X

PLAINTIFFS, THOMAS FLANAGAN, RUSSELL THOMPSON, SARAH MOFFATT,

KYLE GRANT and CHRISTINE FLANAGAN by and through their attorneys, the LAW OFFICES

OF FREDERICK K. BREWINGTON, as and for their *Complaint* against the Defendants, state and

allege as follows:

## PRELIMINARY STATEMENT

1.      This is a civil action seeking monetary relief (including past and on going economic

loss), compensatory and punitive damages, disbursements, costs and fees for violations of Plaintiff's

rights, brought pursuant to the National Labor Relations Act, New York State Labor Law, New York

State Not For Profit Corporation Law, 42 U.S.C. § 1981, New York State Human Rights Law and

New York State Wage Theft Protection Act.

2.      Specifically, Plaintiffs allege that the collective Defendants engaged in retaliation and

negligently, wantonly, recklessly, intentionally and knowingly sought to and did wrongfully deprive

Plaintiffs of their appropriate employment position, title and pay, before ultimately terminating Plaintiffs in retaliation because Plaintiffs made a complaint to the Board of Directors and the Executive Board of the Girl Scouts of Suffolk County in reliance on and in accordance with the GIRL SCOUTS OF SUFFOLK COUNTY HANDBOOK policies and procedures, in opposing suspected fraud, accounting or auditing irregularities, and suspected regulatory, compliance and ethical issues concerns and violations. These retaliatory acts resulted in misrepresentation, misinformation, a fully negative impact upon Plaintiffs, humiliation, embarrassment, depravation of job opportunities, loss of income and retirement benefits, loss of career, permanent injury and harm and other results which continue to mount.

3.      Specifically, Plaintiffs allege that the collective Defendants engaged in retaliation and negligently, wantonly, recklessly, intentionally and knowingly sought to and did wrongfully deprive Plaintiffs of the appropriate employment positions, titles and pay before ultimately terminating all Plaintiffs on June 22, 2021 through acts that were taken against Plaintiffs because of their opposition to violations of high business and personal ethical standards and violations of applicable laws, as outlined and in accordance with, the GIRL SCOUTS OF SUFFOLK COUNTY HANDBOOK policy and procedures. These acts committed by Defendants resulted in misrepresentation, misinformation, harassment, retaliation, adverse employment consequences, character assassination, negative impact regarding all Plaintiffs, humiliation, embarrassment, depravation of job opportunities, deprivation of employment, loss of career, permanent injury and harm and other results which continue to mount.

4.      Plaintiffs allege that collective Defendants directly acted and/or allowed its agents, employees, representatives and/or officers to act maliciously and in retaliation, enacting and executing retaliatory policies and procedures, which caused Plaintiff to suffer injuries, which

include but are not limited to:

- Loss of employment;
- Denial and challenge of right to unemployment benefits;
- Loss of income;
- Emotional distress;
- Loss of self worth;
- Humiliation;
- Embarrassment;
- Loss of career;
- Loss of reputation;
- Loss of benefits, pay, future income and pension funds;
- Retaliation;
- Slander;
- Libel

5.    Said acts were done knowingly with the consent and condonation of the GIRL SCOUTS OF SUFFOLK COUNTY(hereinafter "GSSC" or "GIRL SCOUTS"), and the former CEO of GSSC,  the EXECUTIVE BOARD of GSSC in their individual and in their official capacities, with the express purpose of targeting, injuring and silencing  the Plaintiffs, and generally violating their rights as protected by the United States and New York State Constitutions, federal and state statutes, rules and regulations.

## JURISDICTION AND VENUE

6.    The jurisdiction of this Court is invoked under 28 U.S.C. §§1331 and 1343.

7.    This Court is requested to exercise pendant jurisdiction with respect to Plaintiff's State law claims pursuant to 28 U.S.C.§ 1367.

8.    Venue in the Eastern District of New York is proper under 28 U.S.C. §1391, based on the fact that Plaintiffs reside in Suffolk County, New York and the Defendants are conducting business in the State of New York, specifically Suffolk County.  Upon information and belief the individual Defendants reside in the Eastern District of New York.

9.  Prior to the filing of this Complaint, a copy of same was duly served on the Attorney General of New York State 300 Motor Parkway, Suite 230, Hauppauge, New York 11788.

## PARTIES

10.  Plaintiff, THOMAS FLANAGAN (hereinafter "MR. FLANAGAN"), at all times relevant in this Complaint, is a citizen of the United States of America. MR. FLANAGAN was employed by the GIRL SCOUTS from October 5, 1998 until being wrongfully terminated by GSSC on June 22, 2021. MR. FLANAGAN resides in the County of Suffolk, State of New York and the time of his termination was Chief Operating Officer for the GSSC.

11.  Plaintiff, RUSSELL THOMPSON (hereinafter "MR. THOMPSON"), at all times relevant in this Complaint, is a citizen of the United States of America. MR. THOMPSON was employed by the GIRL SCOUTS from June 26, 1995 until being wrongfully terminated by GSSC on June 22, 2021. MR. THOMPSON resides in the County of Suffolk, State of New York and the time of his termination was Chief Financial Officer for the GSSC.

12.  Plaintiff, SARAH MOFFATT (hereinafter "MS. MOFFATT"), at all times relevant in this Complaint, is a citizen of the United States of America. MS. MOFFAT was employed by the GIRL SCOUTS from January 7, 2002 until being wrongfully terminated by GSSC on June 22, 2021. MS. MOFFATT resides in the County of Suffolk, State of New York and the time of her termination was Chief of Girl Experience for the GSSC.

13.  Plaintiff, KYLE GRANT (hereinafter "MR. GRANT"), at all times relevant in this Complaint, is a citizen of the United States of America. MR. GRANT is an African American man and was employed by the GIRL SCOUTS from September 12, 2002 until being wrongfully terminated by GSSC on June 22, 2021. MR. GRANT resides in the County of Suffolk, State of New

York  and the time of his termination was Director of Technology for the GSSC.

14.　　Plaintiff, CHRISTINE FLANAGAN (hereinafter "MS. FLANAGAN"), at all times relevant in this Complaint, is a citizen of the United States of America.  MS. FLANAGAN was employed by the GIRL SCOUTS from July 7, 2005 until being wrongfully terminated by GSSC on June 22, 2021.  MS. FLANAGAN resides in the County of Suffolk, State of New York and at the time of her termination was Director of Public Relations for the GSSC.

15.　　During all times relevant to this Complaint the Defendant GIRL SCOUTS OF SUFFOLK COUNTY, INC. (hereinafter "GSSC" or "GIRL SCOUTS") was and is a corporation of the State of New York, incorporated under the New York State Not for Profit Corporation Law. Upon information and belief, GSSC oversees, maintains, manages, supervises, controls and is the employer of Defendants.  GSSC is an employer within the definition of the New York State Executive Law, and employs well over 15 employees.

16.　　GSSC at all times relevant is a corporation, association, organization or trust described in section 501 (c)(3) of the United States Internal Revenue Code and receives and utilizes federal funds and assistance in the conducting of its functions within the County of Suffolk, state of New York.  Such federal funds include but are not limited to $602,500.00 received in 2020 and $562,000.00 in federal aid under the Corona Virus Aid Relief and Economic Security Act (CARES ACT) received in 2021.  These federal funds were issued to help prevent layoffs and avoid severe salary cuts of greater than 25% to the employees of GSSC.

17.　　DEFENDANT, PAMELA MASTROTA (hereinafter "MASTROTA" or "FORMER CEO"), is the former President and Chief Executive Officer for the GIRL SCOUTS OF SUFFOLK COUNTY and is sued in her individual and former official capacity, and was at all times herein

5

mentioned a decision maker and supervisor of the staff of the GSSC, and was employed by the GSSC under the direction of Defendant GSSC. The FORMER CEO was at all times relevant to this Complaint acting in furtherance of the scope of her employment.

18.     DEFENDANT, EMILY BROWN (hereinafter "BROWN"), was the Fund Development Coordinator of the GSSC and is sued herein in her individual and former official capacity, and was at all times herein mentioned was employed by the GSSC under the direction of Defendants Ms. MASTROTA and GSSC, and was at all times relevant to this complaint acting in furtherance of the scope of her employment.

19.     DEFENDANT TAMMY SEVERINO (hereinafter "SEVERINO" or "INTERIM CEO") is the Interim President and Chief Executive Officer for the GIRL SCOUTS OF SUFFOLK COUNTY and is sued in her individual and official capacity, and is at all times herein mentioned a decision maker and supervisor of the staff of the GSSC, and is working on behalf as an employee, agent and/or contractor for the GSSC under the direction of Defendant GSSC. The INTERIM CEO is at all times relevant to this Complaint acting in furtherance of the scope of her employment.

20.     DEFENDANT DONNA SMELAND (hereinafter "CHAIR" or "BOARD CHAIR" or "SMELAND) is the BOARD CHAIR of the GSSC and is sued herein in her individual and official capacity, and was at all times herein mentioned a director, officer or trustee of GSSC, and was at all times relevant to this Complaint acting in furtherance of the scope of her position as BOARD CHAIR.

21.     DEFENDANT JACQUELINE GORDON (hereinafter GORDON" is the 1st Vice Chair of the GSSC and is sued herein in her individual and official capacity, and was at all times herein mentioned a director, officer or trustee of GSSC, and was at all times relevant to this Complaint acting in furtherance of the scope of her position as 1st Vice Chair.

6

22.     Defendant DAWN LOTT, (hereinafter "LOTT") is the 2nd Vice Chair of the GSSC and is sued herein in her individual and official capacity, and was at all times herein mentioned a director, officer or trustee of GSSC, and was at all times relevant to this Complaint acting in furtherance of the scope of her position as 2nd Vice Chair.

23.     Defendant SARAH MCCANDLESS (hereinafter "MCCANDLESS") is the 3rd Vice Chair of the GSSC and is sued herein in her individual and official capacity, and was at all times herein mentioned a director, officer or trustee of GSSC, and was at all times relevant to this Complaint acting in furtherance of the scope of her position as 3rd Vice Chair.

24.     Defendant BRANDY SCOTT (hereinafter "SCOTT")is the Treasurer of the GSSC and is sued herein in her individual and official capacity, and was at all times herein mentioned a director, officer or trustee of GSSC, and was at all times relevant to this Complaint acting in furtherance of the scope of her position as Treasurer.

25.     Defendant JENNIFER FRIEDMAN (hereinafter "FRIEDMAN") is the Secretary of the GSSC and is sued herein in her individual and official capacity, and was at all times herein mentioned a director, officer or trustee of GSSC, and was at all times relevant to this Complaint acting in furtherance of the scope of her position as Secretary.

26.     Defendants SMELAND, GORDON, LOTT, MCCANDLESS, SCOTT and FRIEDMAN and were the officers of the GSSC, were at all times relevant to this complaint fiduciaries charged with the legal responsibility to perform the function of their offices  and acted on behalf of the Board and are hereinafter collectively referred to as "BOARD" or "EXECUTIVE BOARD".

## **FACTUAL ALLEGATIONS**

27.    According to its website, Girl Scouts of Suffolk County (GSSC) is the largest youth-serving agency on Long Island, serving more than 40,000 girls and 7,000 adult volunteers. It is believed that this statement is no longer true.  As of June 2021, because of loss of membership, it was considered a small-sized council (under 10,000 girls.)  The GSSC trains and sponsors regular programs aimed at instructing girls and young women in life and societal important matters that directly impact, support and seek to address matters of public health and public safety. According to their website, one of every four girls in grades K through 12 in Suffolk County is a Girl Scout.

28.    The Girl Scouts of Suffolk County has a long history in Suffolk County. The following limited facts provide background of its existence and the presence on Long Island:

   a.    1912 - The first Girl Scout troop is organized by Juliette Gordon Low in Savannah, Georgia.

   b.    1915 - The first troop in Suffolk and Long Island, and the 12th in the nation, is organized in Huntington.

   c.    1930 - Birdsall Otis Edey, noted environmentalist from Bellport, becomes the first and only Long Islander elected president of Girl Scouts of the U.S.A.

   d.    1935 - Seven individual councils begin delivering Girl Scout programs in Suffolk County.

   e.    1968 - Suffolk County Girl Scout Council is created and chartered, consolidating all Suffolk units into a centralized service delivery organization.

29.    Girl Scouts of Suffolk County is a not-for-profit corporation governed by a board of directors and administered by President & CEO. The public facing documents on its website and publications claim that the council has a staff of more than 90 employees and interfaces with a dedicated force of more than 7,000 adult volunteers, and has annual revenue in excess of well over

one million dollars. While the annual revenue is in excess of well over one million dollars, the statements of adult volunteers is over stated as is the number of girls served. It is estimated that the number has eroded considerably since Yvonne Grant left. As of today, it is believed that the number of Girls Served is about approximately 15,500 (vs 40,000) and the number of Adults Served is about 5,700 (vs 7,000). Further, the actual membership numbers are approximately 7,500 registered girls and 2,700 registered adults.

30. In April 2015 Touro Law Center and Girl Scouts of Suffolk County announced an all-new Justice Patch Program. Aimed at Public Safety and Well Being, the program was designed to develop a sense of fairness, an understanding of why we have laws and how they can be changed when they don't work. Girls will learn how laws are designed to help people, and the role that lawyers and judges fill in the community. The Touro Law Patch Program Requirements include selecting one of the following:

a. Take a Tour of Touro! (Required) Plan a visit to either the Touro Law Center or the Court house in Central Islip to learn more about our legal system!

b. At Touro Law Center, see where law students learn, the clinic where people with legal problems come for help, and the Public Advocacy Center.

c. At the Court House in Central Islip, you will have the opportunity to meet with a judge and her staff, learn about her job and the different kinds of judges that exist.

d. Become an Advocate: Pick a topic you feel strongly about and make a five minute presentation to convince others why your issue is important. The topic choice is yours: the environment, animal cruelty, housing, school, or anything else you think is important. Get feedback from your audience. Did they learn anything new from your presentation? Did you make them see things in a different way?

e. Student Rights: Research the rights of students in school. For example, is what you put in your locker private? Can you wear anything you want to school? Can the school look through your backpack? May the school force you to walk through a metal detector? Can you refuse to say the Pledge of Allegiance? Can a teacher take

your phone? You may be surprised at what you discover. Share what you have learned with others.

f. Trials and Tribulations: To learn more about the trial process, participate in a mock trial through your school's mock trial team or better yet, at Touro Law Center! What did you learn from this process? What surprised you?

g. Great Debate: Select a law to research with your troop. What would happen if we didn't have this law? How would it affect people? Divide the troop into two groups. Have one half of the group argue in favor of the law and the other against it.

h. Career Exploration: Research at least three different careers in the field of law. What does the job entail? What type of schooling is required? Create a pamphlet highlighting the careers you investigated. Share the pamphlet with the members of your troop and at least one other.

31.     The Girl Scouts of Suffolk County engages in community safety and health programs and trains and instructs youth how to assist and address public health and safety issues so as to be of aid to the community at large.  One such program is the  Suffolk County Sheriff's Office Patch Program.

32.     The Suffolk County Sheriff is the Chief Law Enforcement Officer in Suffolk County and is responsible for crime prevention and protecting life and property. The Suffolk County Sheriff also maintains efficient response to both emergency and non-emergency requests for law enforcement service, and has oversight of the largest suburban correctional facility in New York State.

33.     The Suffolk County Sheriff's Office Patch represents the role that law enforcement officers play in society. Girls who earn the patch will learn about careers in the field and the responsibilities of Correction Officers and Deputy Sheriffs and how they protect public safety.

34.     In the fall of 2015, the Girl Scouts of Suffolk County partnered with America's PrepareAthon! to host Dare to Prepare, a two-day camping excursion and training session at Camp

Edey in Bayport, NY. The local Girl Scouts learned how to be prepared for potential disasters on Long Island, and the Girl Scouts gained insight into the emergency responses they remembered experiencing during Superstorm Sandy in 2012.

35.     On the first day of the event, scouts learned self-defense and survival skills from U.S. Marine Corps Staff Sgt. Antonio Narein. Afterward, they worked toward earning the Safety and First Aid Badge in a session on how to handle medical emergencies. Participants also developed family emergency and pet emergency plans.

36.     Then, President and CEO for Girl Scouts of Suffolk County Yvonne Grant, speaking about the program stated, "Dare to Prepare was a comprehensive and innovative program that taught the girls how to stay calm and react wisely in an emergency situation," she also said "We were delighted to partner with FEMA and local agencies to bring such an informative and practical-use experience to our girls."

37.     Health & Wellness Initiative are part of the activities of GSSC. According to their own literature, Health is a state of complete physical, mental, and social well-being. Wellness is the intentional development of the whole self, a process of searching for tools to make you healthier and happier and to equip you for continued growth and development. As part of Girl Scouts of Suffolk County's commitment to their girls and their families, the GSSC engage in a series of activities and resources to support teaching and providing support for self-care.

38.     The Health & Wellness Intiative are key components in addressing the larger community and societal health, safety and wellness facing the Suffolk area and in a greater way the world in which we live. Their programs are expansive and encompass multiple areas of mental, physical and emotional well being as well as safety for children and adults.

39.     Examples of the types of things which are included in the GSSC Health & Wellness programs are:

       a.      In a Stressful World, This Girl Scout Brings Calm- Of course it's always important to remember to take a step back and really think about your actions before acting on them and your words before you say them. Girl Scout Ambassador Kaitlyn Kropp knows what it's like to need a minute to cool down. She set out to problem solve and help herself and other kids facing similar problems.

       b.      Five (5) Ways for Girl Scouts to Mindfully Reduce Stress- Between school and homework, extracurricular activities, sports, family responsibilities, part-time jobs, and college applications, girls from Daisies to Ambassadors are under increasing stress and pressure in their lives. Time to relax or play is so vital to their growth, yet so difficult to make time for in their busy schedules. This is where mindfulness and stress-relief techniques come in.

       c.      Girl Scouts of Suffolk County's Partner Patch Programs- For these programs, GSSC joins with a local organization or group to offer Girl Scouts a special experience of learning and community service.  For those that focus on health and wellness, check out FARE Food Allergy Awareness, Northwell Health Go Health Patch, King Kullen Nutrition Tour, Whole Foods Market Tour and Wild By Nature Market Tour.

40.     In July of 2020, Plaintiffs collectively drafted and delivered a letter to the Chair of the Board and the Executive Committee of GIRL SCOUTS OF SUFFOLK COUNTY under the promise and protection of the Girl Scout Council's Whistle Blower policy.

41.     That letter was drafted in response to the unethical treatment of the five (5) Plaintiffs and on behalf of other employees too fearful to come forward due to the treatment which was being suffered employees including but not limited to the Plaintiffs, and actions which Plaintiff realized would place the entire GSSC organization, including its members and programs in jeopardy.

42.     Collective Plaintiffs' suffering was caused by former Chief Executive Officer PAMELA MASTROTA and sanctioned by the Chair of the Executive Board DONNA SMELAND and the entire EXECUTIVE BOARD of the GIRL SCOUTS OF SUFFOLK COUNTY.

43.     MASTROTA'S unethical behavior included cutting salaries up to 40%, removing employees from their titles, threatening employees, misrepresenting the financial status of GSSC and publicly demeaning GSSC employees. All of this behavior was in direct contradiction to the ethics and values of the Girl Scouts policies, procedures and past practices, and seriously violated the behavioral codes proscribed in the GSSC Handbook. Through the loss of the programs and efforts provided to its members, adults and families, this erosion of the internal structure of the GSSC placed the public health, well being and safety at risk.

44.     Specific examples of the violations of policies, disregard of employees rights, unethical and unlawful behavior reported to the BOARD OF DIRECTORS include, and are not limited to the following facts.

45.     On April 17, 2020 MS. MASTROTA during her first week of employment with GSSC stated that Mr. GRANT, Director of Technology, would be one of the first people fired and that firing would occur within three to four months. This statement was made prior to MASTROTA ever meeting Mr. GRANT, She stated that MR. GRANT was unqualified, overpaid and only obtained his position because his mother Yvonne Grant was the previous CEO.

46.     As background, Mr. GRANT was essentially born into the GSSC as he was just a baby when his mother began volunteering with GSSC. Mr. GRANT is the son of Yvonne Grant, who worked her way up from volunteer to become the first African American CEO of GSSC. Mr GRANT volunteered and worked for GSSC from the age of thirteen (13), steadily progressing from custodian to graphic designer, to Art Director and ultimately to Director of Technology before being demoted by MASTROTA and ultimately terminated by GSSC.

47. Mr. Grant was the head of the Technology Department and its sole manager for more than seven (7) years when MASTROTA began her attack upon him by labeling Mr. GRANT incompetent, expendable and the recipient of nepotism while cutting his salary 40%, removing his title, and demanding the same work load.

48. Mr. GRANT successfully led GSSC through three (3) major technology overhauls including implementing software on behalf of the national Girl Scouts Organization.

49. The previous day, April 16, 2020 MASTROTA had a 57 minute phone conversation with Mr. FLANAGAN in which MASTROTA was abusive, bullying and disrespectful. MASTROTA accused Mr. FLANAGAN of withholding information from her. She called Mr. FLANAGAN part of the "problem." This was on her fourth day at the agency and Mr. FLANAGAN felt that she threatened my job.

50. Following discussions with MASTROTA in which Mr. FLANAGAN supported the value of Mr. GRANT to GSSC, MASTROTA, in an act of retaliation for speaking up for Mr. GRANT, increased Mr. Flanagan's salary cut from 20% to 30%. This additional salary cut was nothing more than retaliation in an attempt to maintain control, keep Plaintiffs in line and fearful of speaking out against MASTROTA'S unethical and detrimental actions.

51. On or about May 12, 2020 then Chief Financial Officer THOMPSON, who also supported Mr. GRANT and who was previously told by MASTROTA that he was not a CFO, was informed that his salary was being reduced 30%.

52. On or about May 20, 2020, during a meeting with Mr. FLANAGAN and Director of Human Resources, Ildalisa Diaz, Ms. MASTROTA repeatedly warned Plaintiff FLANAGAN and Ms. Diaz to be careful, with Mr. GRANT because he could get angry and destroy GSSC property

including its computer systems infrastructure. This statement was not based on any history or good faith. The former CEO also continued to allege that MR. GRANT was not present at the agency. Not only was this an attack on Mr. GRANT using the racial stereotype that staff should be fearful of an *angry Blackman*, MASTROTA also continued the same negative racial stereotype of the slacker Black worker she used when describing Mr. GRANT'S mother, former CEO Yvonne Grant.

53.     Of the five directors, Mr, Grant, an African-American, received the highest pay cut at 40%. Kyle has been targeted by the CEO since her first week at the agency, before she saw his job description or his resume and before she met him. All the people of color were cut 20% or higher with the lowest cut of 10% going to a Caucasian employee.

54.     In a shocking statement, MASTROTA stated that Mr. Grant makes "crazy money" for his role and his "level of activity." This statement was false and clearly targeting Mr. Grant as his position was compensated commensurate with his accomplishments and years of service and is significantly below the average for his position in the market place.

55.     The CEO MASTROTA said that Yvonne Grant played more of a role in Mr. Grant's progression at the agency than me. This is not true. Mr. Grant's hard work earned him his promotions over his 17-year career. Without any knowledge of Mr. Grant's activities Defendant MASTROTA said that Mr. Grant "is not busy enough." At that point, she had not viewed any activity reports or talked about his daily log of activities. Ms. Grant said Mr. Grant makes "too much money." Defendant MASTROTA said she can't "justify" Mr. Grant's title or salary and wants him demoted to a part-time position.

56.     MASTROTA, at a management meeting in April, repeatedly singled out Mr. Grant and Ms. Jenna Kierstedt (African-American woman and Mr. Grant's sister) for their relationship to each other and to the former CEO, humiliating both of them  in front of their colleagues.

57.     At an all-staff meetings, on June 10th, Mr. Grant was singled out and embarrassed. In the June 10th meeting, he was singled out by the MASTROTA who tried to intimate him by suggesting that he was not doing his job. Mr. Grant was forced to defend himself, and Mr. Flanagan voiced his support of Mr. Grant and his work. These are examples of the differential treatment to which Mr. Grant was subjected as a target.

58.     On May 20, 2020 during a BOARD of DIRECTORS meeting, former CEO MASTROTA presented libelous and defamatory slides to the BOARD OF DIRECTORS that disparaged the collective reputations of the management team. The management team of GSSC consisted of all Plaintiffs. One slide specifically stated that the management team "lacks transparency, accountability, [and] key competencies" and are "treated favorably [with] compensation, time and benefits."

59.     At no time prior to the meeting of May 20, 2021 did MASTROTA discuss the slides with the management team. Not a single individual was given the opportunity to defend themselves or answer any of the allegations, claims or accusations. MASTROTA presented the untrue allegations to the BOARD OF DIRECTORS as though there were factual. They were not.

60.     In fact, the management team received the same benefits as all other employees. There is no separate tier for any of the council's medical, financial, or other benefits.

61.     The management team also used the same system for clocking in and clocking out as the rest of the staff. There was no separate time keeping system. The management team was required to work weekends at the Holiday Light Show and shared a schedule of closing the office each evening.

62. All employees received increases each year, not just the management team.

63. Another slide MASTROTA presented to the BOARD accused the Director of Human Resources, Ildalisa Diaz, of a "lack of confidentiality" regarding employee complaints by sharing these complaints with unauthorized members of staff.

64. While these serious accusations were made against Ms. Diaz, they were not discussed consistent with the procedures to address any possible performance concerns, and did not allow Ms, Diaz a forum in which to address those accusations.

65. There was no previous notice to anyone on the management team that Ms. Diaz lacked confidentiality. In fact, members of the management team themselves confided in Ms. Diaz and had no issues regarding confidentiality.

66. Immediately following that BOARD meeting, at 6:00pm, MASTROTA emailed the slides to the management team with the subject line "READ ME FIRST." The email asked whether any of the management team had any questions.

67. Jenna Kierstedt, then the Director of Product Sales & Marketing, an African-American woman, who is also Mr. GRANT'S sister, was crying hysterically and an employee who asked not to be named due to fear of retaliation, emailed a response to MASTROTA defending her character, to which the CEO replied with threats. MASTROTA also cut Ms. Kierstedt's salary 20%.

68. The accusations made by MASTROTA were untrue and damaging to Plaintiff's collective reputations which were built over nearly 100 years of combined service.

69. On May 21, 2020 during a management team meeting, MASTROTA asked the team for comments on the slides.

70. Being careful with his words, Mr. FLANAGAN replied that it was disheartening to see a presentation to the Board comprised of untrue and unfounded accusations made without context, corroboration, or investigation.

71. Ms. MOFFATT and Jenna Kierstedt expressed that the slides and comments were both disparaging and a completely inaccurate portrayal of who each of the team were as persons and the work that each provided to GSSC throughout their years of service.

72. The defamatory and libelous comments were, and continue to be, detrimental not only to Plaintiffs, but to the well being of GSSC.

73. During this meeting MASTROTA warned the management team, and Plaintiffs in particular, that if they wanted to report her to the BOARD, they should "be prepared" because she will be there, but not to defend them.

74. This overt threat in an attempt to silence Plaintiffs from bringing these false allegations to the BOARD OF DIRECTORS was not only a bold and blatant attempt to suppress the wrongdoing occurring within the GSSC, but was completely against Girl Scouts policy. This obvious bullying tactic and threat was a further attempt by MASTROTA to silence Plaintiffs, as well as control the narrative regarding Plaintiffs, to the detriment of Plaintiff's careers.

75. Immediately following this meeting, MASTROTA met with Mr. FLANAGAN and informed him that his salary was being reduced by a total of 40% and his position as Chief Operating Officer was being eliminated. This further reduction was confirmed by email to then Chief Financial Officer, Mr. THOMPSON. This again is was a clear case of unethical and retaliatory conduct by MASTROTA.

76.     On May 12, 2020, at a Finance Committee Meeting, former CEO MASTROTA alleged that two-thirds of all Girl Scout councils were implementing salary reductions and that the current management salaries of GSSC were the equivalent of a $20-million Girl Scout agency.

77.     However, these pretextual allegations designed to justify the unethical demotions and salary reductions fail when viewed in the face of and against legitimate documentation prepared by agencies outside of GSSC. According to The Girl Scouts of the United States of America, the reality is that only 2% of all Girl Scout Councils implemented, or planned to implement, any salary reductions whatsoever. Additionally PNP Staffing Group, a third party which specializes in non-profit agencies, reported that GSSC's salary was well within the range of a council of its respective size for the time period relevant to this Complaint.

78.     MASTROTA also alleged that GSSC's salary was 20% - 30% higher than most Girl Scout Councils. MASTROTA repeated these demonstrably false statements at a management meeting the following day in further attempts to justify her actions in carrying out the pretextual and targeted title removals and unfair salary reductions of Plaintiffs and other employees.

79.     On May 13, 2020, former CEO MASTROTA announced to Mr. FLANAGAN and Director of Human Resources, Ildalisa Diaz, that she informed the Finance Committee that two-thirds of all Girl Scout councils are implementing salary cuts.

80.     On May 20, 2020 at a GSSC BOARD OF DIRECTORS meeting, former CEO PAMELA MASTROTA declared that the GSSC were the highest paid Girl Scouts council in the country for staff compensation at 75% of total revenue while most councils were at 60%.

81.     The Girl Scouts of the United States of America (GSUSA), the national Girl Scout organization, ranks and compares Girl Scout Councils by the combined number of girls and adults

who pay the annual membership fee. Based on the applicable national criteria, GSSC was a mid-sized Girl Scout Council, how as of June 2021, because of loss of membership, it was considered a small-sized council (under 10,000 girls.)

82. There are 28 mid-sized councils in the United States with a revenue ratio of 57.25%. The high is 69 % while the low is 37%. In May of 2020 the GSSC were at a ratio of 60% and the only individual at the top of the salary chart was former CEO MASTROTA who was the fifth highest paid CEO of mid-sized Girl Scout councils in the country, and the highest paid CEO in the New York Girl Scouts group.

83. This blatantly false and fraudulent reporting of GSSC's financial position that was made to the BOARD OF DIRECTOR'S by MASTROTA caused severe harm to Plaintiffs, and GSSC.

84. MASTROTA falsely alleged that GSSC was bleeding money, was suffering from the mismanagement of Yvonne Grant and the COVID-19 pandemic as a pretext for making excessive salary cuts to Plaintiff's salaries and a plan on eliminating their job titles, all without suffering any salary reduction of her own.

85. In fact, at the time MASTROTA made the excessive salary cuts, GSSC possessed more than $5,000,000 in liquid assets AND more than $600,000 from the federal Paycheck Protection Program.

86. Concerned for the good of the employees the GSSC and its programs, as well as those that they served, on June 8, 2020 Plaintiffs forwarded a letter to the BOARD CHAIR and the EXECUTIVE COMMITTEE of the GIRL SCOUTS OF SUFFOLK COUNTY requesting a conference in an effort to resolve the multitude of issues faced by GSSC and impacting the future

of all employees, including Plaintiffs.

87.     On June 9, 2020 Plaintiffs received correspondence from DONNA SMELAND, the BOARD CHAIR, and the law firm of Ingerman Smith, LLP indicating that Ingerman Smith was the representative of GSSC and a meeting would be held between the parties in the near future. Essentially, Plaintiffs were denied the opportunity to then meet with the Board.

88.     On June 30, 2020 a teleconference was held between counsel for Plaintiffs and Defendants where Plaintiff's counsel reiterated that they were reporting unethical violations under the GSSC Whistleblower policy. In that meeting a request was made for more specifics and details to be provided by Plaintiffs.

89.     While still fearful for further retaliation, on or about July 15, 2020 a 36 page correspondence was delivered by Plaintiffs to GSSC in care of the BOARD CHAIR and the EXECUTIVE COMMITTEE. The correspondence was described as a "Complaint" and designated Plaintiffs as "Whistleblowers."

90.     In their Complaint, Plaintiffs described violations of GSSC ethics by Former CEO MASTROTA including mismanagement of PPP funds, defamation, slander, libel, disparagement of staff, threats of retaliation, disparate treatment, abuse of authority, intimidation, harassment, bullying, retaliation, abuse, lack of professionalism, fraud, misrepresentation of financial facts, accounting irregularities, and violations of the New York State Wage Theft Protection Act.

91.     In addition to the detailed unethical behaviors cited by Plaintiffs, complete with supporting documents in the form of letters, audio clips and citations to the GSSC Handbook, Plaintiffs described the mental, physical and psychological toll the unethical behavior was inflicting upon employees and each of them.

92.     In making their Complaint to the BOARD CHAIR and EXECUTIVE COMMITTEE,

Plaintiffs relied upon the GSSC Employee Handbook's WhistleBlower policy as guidance and

protection.  Regarding the Whistle Blower policy the Handbook states in relevant part:

> "Girl Scouts of Suffolk County requires its directors, officers and employees to observe high standards of business and personal ethics in the conduct of their duties and responsibilities. As employees and representatives of the Girl Scouts of Suffolk County, we must practice honesty and integrity in fulfilling our responsibilities and complying with all applicable laws and regulations.  The matters which should be reported under this policy include suspected fraud, theft, embezzlement, accounting or auditing irregularities, bribery, kickbacks, misuse of our assets or suspected regulatory, compliance, or ethics related issues, concerns or violations.  These policies are not a vehicle for reporting violations of the Girl Scouts of Suffolk County's applicable human resources policies, problems with co- workers or managers, or for reporting issues related to alleged employment discrimination or sexual or any other form of unlawful harassment, all of which should be dealt with in accordance with the EEO policies of this manual.

> Reporting Responsibility

> It is the responsibility of all directors, officers and employees to report violations or suspected violations of high business and personal ethical standards and/or applicable legal requirements (violations) in accordance with this whistle blower policy.

> No Retaliation

> No director, officer or employee who in good faith reports a violation shall suffer harassment, retaliation or adverse employment consequence. An employee who retaliates against someone who has reported a violation in good faith is subject to discipline up to and including termination of employment. This whistle blower policy is intended to encourage and enable employees and others to raise serious concerns within Girl Scouts of Suffolk County prior to seeking resolution outside Girl Scouts of Suffolk County.

Reporting Violations

Questions, concerns, suggestions or complaints regarding the ethical and legal standards noted above should be addressed directly to the Chair of the Board of Directors.

Chair of the Board of Directors

The Chair of the Board of Directors is responsible for investigating and resolving all reported complaints and allegations concerning the ethical and legal standards noted above and shall advise the CEO/President and the Executive Committee of all such complaints and allegations. The Chair of the Board of Directors is required to report to the full Board of Directors at least annually on compliance activity.

Accounting and Auditing Matters

The Executive Committee shall address all reported concerns or complaints regarding corporate accounting practices, internal controls or auditing brought to its attention. The Chair of the Board of Directors shall immediately notify the Board of any such complaint and work with the CEO/President and the Board until the matter is resolved."

Confidentiality

"Violations or suspected violations may be submitted on a confidential basis by the complainant. Reports of violations or suspected violations will be kept confidential to the extent possible, consistent with the need to conduct an adequate investigation." (Girl Scouts of Suffolk County Employee Handbook pp. 26-28).

93.     Plaintiffs with approximately 100 years of combined dedication and service to the

GIRL SCOUTS relied upon the GSSC Handbook, not only as protection against further harm and

retaliation against each of them, but as the measure and method to correct the wrongs being done to

the institution of the GIRL SCOUTS.

94.     The Board Chair, DONNA SMELAND, does not have authority to spend GSSC

money (Girl Money) without Board Approval. All actions of the Executive Committee, including

hiring of counsel and spending of funds must be ratified by the entire Board (GSSC By-Laws Article

VI, Section 2). There are no ratifications or approvals for the following expenditures found in Board

Meeting Minutes from June 2020 through May 2021.

a. $34,000 spent on an Executive Search Firm to hire the previous CEO, who was separated from the agency after only seven months.

b. $30,000 spent on separation package for the previous CEO, which was significantly higher than any package outlined in the agency handbook.

c. $60,000 spent on Guercio & Guercio law firm to investigate Whistleblower reports, notable when the council already has a law firm on retainer.

d. $12,000 spent on Jackson-Lewis law firm, again notable because the council already has a law firm on retainer (as of June 2021).
e. $9,000 spent on an HR consulting firm, with recommendations NOT revealed

f. $11,000 paid EACH MONTH to consultant serving as Interim CEO since Dec 2020

95.     Instead of responding directly to Plaintiffs, two days later, on July 17, 2020 Plaintiffs

received correspondence from DONNA SMELAND notifying Plaintiffs that GSSC appointed the

law firm of Guercio & Guercio, LLP to serve as independent investigators of Plaintiff's Complaints.

96.     At that time Plaintiffs were assured the investigation would be impartial, thorough

and confidential. However, the consequences suffered by Plaintiffs demonstrate otherwise. Despite

having been requested, the results of the investigation into Plaintiffs assertions were never revealed

to Plaintiffs.

97.     Plaintiffs continue to cooperate and try to save the organization that they loved. On

July 28th, 30th and 31st of 2020, Plaintiffs were individually interviewed, via video conference, by

Christopher Mestecky, Esq. of Guercio & Guercio, LLP. Each interview encompassed hours of

questioning by Mr. Mestecky and good faith responses and answers from each respective Plaintiff.

98.     Each interview was extremely painful for each individual Plaintiff to undergo, as each Plaintiff was forced to recount and relive each agonizing instance of abuse suffered as an employee of GSSC and provide details to support their detailed reports, complaints and notices as Whistleblowers.

99.     Plaintiffs would often lament, "We are Girl Scouts!   We are not supposed to be going through this!"  Plaintiffs built their careers on upholding and teaching honor to the girls of Suffolk County New York and were often in disbelief and bewilderment regarding the treatment to they were subjected upon them blowing the whistle.  Additionally, the lack of swift response by GSSC to the evidence presented to GSSC was baffling to Plaintiffs.

100.     As though they were the subject of the investigation, on August 4, 2020 Plaintiffs received a list of document requests from Guercio & Guercio allegedly specific to each Plaintiff, based upon the interviews and concerns and Complaints of Plaintiffs.

101.     Continuing in their cooperation, on August 13, 2020 Plaintiffs responded to Guercio & Guercio's document requests. In that correspondence Plaintiff reiterated their need for confidentiality and all protections afforded as Whistleblowers.

102.     Additionally, Plaintiffs outlined the ways in which the requests were deficient as a tool for analyzing the ethical breaches of the former CEO.  The requests also merely requested documents addressing the surface evidence of title and salary reductions rather than the deeper substantive claims asserted by Plaintiffs.

103.     Among the documents absent from the requests of Guercio & Guercio, were any requests for documents evidencing the misrepresentation in financial reporting of the former CEO, the differential treatment of Plaintiff KYLE GRANT, any documentation as to the former CEO's

overt disdain for the relationship all Plaintiff's shared with PAMELA MASTROTA'S predecessor and first African American CEO, Yvonne Grant.

104.     Of note, Plaintiff KYLE GRANT is the son of Yvonne Grant.  Both are African American. Not only was KYLE GRANT forced to endure the race based verbal assault upon the legacy of his mother, Yvonne Grant by MASTROTA, but collective Plaintiffs were exposed to the false and negative remarks regarding Ms. Grant, her work ethic, and the clearly unmerited attack on the way in which the GSSC was operated under her leadership.

105.     Examples of the accomplishments and strides made under Ms. Grant's leadership and during her 30 year career include and are not limited to:

> ▸     Ms. Grant opened a Science Technology Engineering and Math (STEM) Center and brought Girl Scouts to thousands of girls in under-served communities each year of her tenure;

> ▸     Ms. Grant  spearheaded a partnership between GSSC and Brookhaven National Lab, the first such partnership involving Girl Scouts of its kind nationwide;

> ▸     Ms. Grant generated, during the last few years of her tenure, more than $1.2 million in grant and donation money;

> ▸     In June of 2019, Sylvia Acevedo, National CEO for Girl Scouts of the USA visited the GSSC camp in Yaphank, NY, to see first hand the Discovery World STEM Center.

> ▸     In March 2019, Kathy Hopinkah Hannan, President of Girl Scouts of the USA's Board of Directors, attended GSSC's Making An Impact Breakfast.
> ▸     Ms. Grant received numerous community recognitions and awards from among others, the Long Island Press, Long Island Business News, Soroptimist Society, and Town of Brookhaven.

> ▸     The STEM Center which Ms. Grant founded was set to be named in her honor prior to her retirement.  However, the MASTROTA and the BOARD OF DIRECTORS refused to follow through.  While a plaque was designed and ordered by Plaintiff Mr. FLANAGAN, the plaque has yet to be hung and the Center remains to be named in honor of its founder.

101. Additionally in 2020, BOARD CHAIR SMELAND, in a further act of animus and differential treatment, removed Ms. Grant as a Girl Scout National Delegate in contravention of both GSSC by-laws and the will of Girl Scout voters.

102. Ms. Grant, MR. FLANAGAN and MS. MOFFATT were elected to be national delegates in April of 2020. SMELAND removed Ms. Grant in June of 2020 and replaced her with MASTROTA. Of note, even if Ms. Grant voluntarily resigned her delegate position, the GIRL SCOUT bylaws state that any delegate replacement must be an elected alternate delegate, of which there were two others.

103. On August 25, 2020 Plaintiffs, in good faith, provided Guercio & Guercio with documents and files relevant to Plaintiffs' complaint and in support of their interviews with Guercio & Guercio. Although these documents were not requested by Guercio & Guercio they were and remain integral in supporting Plaintiffs' claims. The supplied correspondence on August 25, 2020 included audio files and other specific files labeled "WHISTLEBLOWER GRIEVANCES."

104. On August 29, 2020 Plaintiff requested an update from Guercio & Guercio regarding their investigation into Plaintiffs' complaints. That same day Guercio & Guercio responded that they were still in the process of reviewing documentation supplied by GSSC. PLAINTIFFS were never supplied with any updates as to their complaints, nor were they provided with copies of any of the documentation supplied by GSSC.

105. On September 29, 2020 the Human Resources Department of GSSC asked Mr. GRANT to investigate a technology issue. After investigation Mr. Grant learned that this supposed technology issue was in fact merely a pretext for another attack upon Plaintiff GRANT.

106.    In this instance MASTROTA, in conjunction with EMILY BROWN, created a false technology problem and accused Plaintiff GRANT, the former Director of Technology, of being unwilling and unable to correct the problem.

107.    In the midst of an ongoing Whistleblower investigation into unlawful, improper and unethical behavior at GSSC, MASTROTA and BROWN agreed that BROWN was not receiving important emails, the same problem MASTROTA complained of regarding Mr. GRANT on several other occasions.

108.    In order to diagnose and alleviate the issue, Mr. GRANT sought and received permission from Ms. MASTROTA and Ms. BROWN to enter and diagnose their GSSC emails. Upon investigation, Mr. GRANT determined that not only did Ms. BROWN receive all of the emails she claimed she had not, but she also destroyed evidence and deleted the emails in question and then deleted the folder containing all of the deleted emails. This spoliation, fabrication and attempted deceit was done in an attempt to further wrongfully cast MR. GRANT as incompetent and justify him being fired and certainly justify him receiving a 40% pay cut.

109.    Plaintiffs immediately sent correspondence to Guercio & Guercio updating all Defendants as to this latest instance of blatant, fraudulent and unethical behavior.

110.    Plaintiff again asked Guercio & Guercio for an update on their investigation of GSSC and Plaintiff's Whistleblower Complaints. None was provided.

111.    On October 23, 2020 Plaintiffs wrote to Guercio & Guercio again inquiring as to the status of the investigation. None was provided.

112.    On October 30, with Plaintiff's working under the tremendous pressure of upholding the values of Girl Scouts, working under the same conditions which led them to become

28

Whistleblowers and living through a pandemic, Plaintiffs wrote a letter to Guercio & Guercio as a final request for the status of their investigation. Plaintiff's continued to be given the run around.

113.    On November 3, 2020 Plaintiff received correspondence from Guercio & Guercio that Plaintiff's are to direct all future correspondence to Craig Jackson of the law firm Jackson and Lewis.  Plaintiffs requested clarification from Guercio & Guercio as to the role of Jackson Lewis in this process.  Plaintiffs received no response as to the status or results of the investigation, no comments on any of Plaintiff's claims, and no explanation of the role a third law firm, Jackson and Lewis.

114.    On that same date Plaintiff called and emailed Jackson Lewis and received no response.

115.    On November 8, 2020 DONNA SMELAND contacted all Plaintiffs requesting a meeting with each to be held November 10, 2020.

116.    On November 12, 2020 DONNA SMELAND issued a memorandum for a "wage adjustment regarding the payroll changes that occurred during the pay period ending June 12, 2020.

117.    On or about November 19, 2020 former CEO PAMELA MASTROTA was either terminated or resigned under the pressure of possible termination from her position as Chief Executive Officer of the GIRL SCOUTS OF SUFFOLK COUNTY.

118.    Shortly thereafter, EMILY BROWN was either terminated or resigned from her position as Fund Development Coordinator with GSSC.

119.    At the conclusion of 2020, following a lengthy investigation where Plaintiffs never received any communication from GSSC regarding their investigation of Plaintiff's assertions of unethical behavior; after suffering through the tenure and resignation of former CEO MASTROTA

and (title) EMILY BROWN, and the onslaught of a global pandemic, Plaintiffs continued to work diligently under the same conditions imposed by the former CEO. Their wages were cut up to 40% and all of their titles were reduced while their workload either increased or remained the same.

120. Defendant SEVERINO was named Interim President and CEO of GSSC in December 2020.

121. On February 2, 2021 Plaintiffs issued correspondence to the EXECUTIVE BOARD of GSSC by writing to their attorneys Ingerman Smith, LLP., regarding Plaintiff's current state of employment, and Plaintiff's lack of being made whole following the actions of former CEO MASTROTA which were approved by the EXECUTIVE BOARD.

122. Specifically Plaintiffs questioned their lack of being restored to their titles, lack of return to their salaries or at least an equitable return and not the 20 - 40% cuts suffered by Plaintiffs. Plaintiffs also questioned the lack of back pay for their unjust salary cuts, the lack of responsiveness from the BOARD OF DIRECTORS to their complaints and the resulting erosion in trust in the organization, a trait that must be embodied within and by the Girl Scouts.

123. Given the non-responsiveness of GSSC, Plaintiff's sought an amicable separation agreement. In the proposed agreement made under Federal Rule of Evidence 408 and the protection as Whistleblowers, Plaintiffs reiterated their dissatisfaction with the treatment they each received since the hiring of former CEO PAMELA MASTROTA. Plaintiffs' have consistently referenced their more than 100 years combined service to GIRL SCOUTS OF SUFFOLK COUNTY, to no avail.

124. On February 9, 2021 GSSC auditors interviewed Plaintiffs regarding fraud, possible fraud and potential litigation. Each Plaintiff provided verbal and written details to the auditors as

well as supporting documents of each claim as asserted in Plaintiff's complaint to as well as supporting documents as requested of them as part of those interviews.

125. On February 22, 2021 Plaintiffs' corresponded with Ingerman Smith as follow up to their February 2, 2021 correspondence and inquired as to whether Ingerman Smith were the proper counsel to contact as there continued to be no response from Defendants.

126. On March 11, 2021 Plaintiffs again followed up on the February 2, 2021 correspondence. Ingerman Smith responded directing Plaintiff to make all further inquiries to Jackson Lewis.

127. Plaintiffs then, on March 11, 2021, emailed correspondence to Jackson Lewis summarizing the previous activity in this matter and enclosed proposed settlement demands under the strictures of Federal Rule of Evidence 408.

128. On March 17, 2021 Jackson Lewis responded by denying any wrongdoing on behalf of the GSSC and refusing to comment on Plaintiffs proposal.

129. On or about March 30, 2021 Defendant SEVERINO threatened Whistleblowers in a meeting with Plaintiff Flanagan in which she said the board felt threatened and "you don't know what they'll do" when they're threatened and it would be difficult for us to work with the board going forward. She further stated that "Long Island is incestuous," other non-profits will know what is going on, and that Plaintiffs' Whistleblower actions will follow them. Defendant SEVERINO said being together as a group is going to hurt Plaintiffs individually and that "Russ is dragging [them] all down." Defendant SEVERINO asked if Plaintiff Flanagan knew if Russ would be retiring soon, a question she had asked a few times before.

130. Regarding tasks at work, Defendant SEVERINO ordered Plaintiff Flanagan to prepare

an agency-owned house on the Camp Sobaco property in Yaphank for rental on Air-Bnb. On or about May 13, 2021, Plaintiff Flanagan called the Town of Brookhaven and learned that it is against Town ordinance to rent properties on Air-Bnb. Defendant SEVERINO was immediately informed of this information and that the action would be illegal. When told this information, Defendant SEVERINO ordered Plaintiff Flanagan to continue prepping property and to proceed as planned, in violation of Town code. Plaintiff Flanagan objected to doing so. In November 2021, Defendant SEVERINO assigned the task of coordinating rental properties to a new staff position.

131. On April 6, 2021 a teleconference was held between the parties where the proposed separation agreement was discussed. GSSC issued a counter offer to Plaintiffs' proposed separation agreement.

132. On May 5, 2021 the parties again teleconferenced regarding the proposed separation agreement. Plaintiff's first question during this conference from attorney Frederick K. Brewington was whether GSSC was going to terminate Plaintiffs. Defendants, through counsel Jeff Schlossberg of Jackson Lewis, responded that Plaintiffs were not going to be terminated.

133. Plaintiffs informed GSSC on that date that Plaintiffs were not looking to separate from GSSC, but rather sought to be treated fairly. Plaintiffs reminded Defendants of the amount of time individual Plaintiffs devoted to the GIRL SCOUTS. Individual Plaintiffs devoted from 16 - 26 years of their lives to not only a career, but an ideal. Plaintiffs informed Defendants that based upon Defendants weak response to the Proposed Settlement Demand, the parties appeared to be too far apart in negotiations to execute a fair settlement and Plaintiffs were withdrawing their proposed settlement position, and instead will continue in their employment while seeking to be made whole from their respective and collective treatment.

134.    On May 12, 2021 Plaintiffs again teleconferenced with GSSC and clearly and plainly articulated that all Plaintiffs wanted to remain in the employment of GSSC. Plaintiffs repeated their desire to only be made whole for all they have suffered since April of 2020. Plaintiffs then continued to dutifully served the GSSC.

135.    On May 27, 2021, after engaging in good faith discussions Plaintiffs realized that the discussion were futile and provided Defendants with the following language in an email from their counsel to Jeffrey M. Schlossberg, Esq.:

> Further, given this extreme position proposed by you, it is now clear to our clients, and to us, that your clients were never serious about avoiding litigation and settling this case. We thank you for your time. Further, you setting arbitrary deadlines with the shadow of terminating our clients as a threat to intimidate our clients into agreeing to terms which are insulting, is unfortunate. Given that it is clear that our client's must now pursue their rights as whistle-blowers and your vail threat to terminate them, we must remind you and your clients that any form of retaliation and wrongful actions aimed to harm our clients' terms and conditions of their employment will be addressed in the most significant of ways. I trust that you will counsel your clients accordingly. If you wish to discuss terms that make sense, we remain open to your call. **In the meantime, our clients will continue their roles as loyal and dedicated employees maintaining the highest professional standards, as they have done all along.** (Emphasis added)

136.    Plaintiffs continued to work in their positions, having effectively abandoned settlement discussions and cautioned about "retaliation and wrongful actions aimed to harm [Plaintiffs'] terms and conditions of their employment..."

137.    Plaintiffs now know that Defendant SEVERINO knew that they would be fired as she repeatedly said Plaintiff Grant to prepare a document with all council passwords in case he is "hit by a bus" ( a document that already existed); Defendant SEVERINO asked Plaintiff Moffatt to prepare instructions for running camps; she asked Plaintiff Flanagan to prepare instructions for running the light show; and at a staff meeting before they were fired, Defendant SEVERINO told everyone that at the next staff meeting, Donna Smeland would be there with a big announcement.

This which turned out to be Plaintiffs' terminations. A fact known to the other Defendants.

138.    Forty days later, in retaliation, on June 22, 2021 without warning, and despite assertions to the contrary, GSSC terminated each and every Plaintiff's employment under the false pretense that the Plaintiffs did not wish to continue their employment. In a contrived and calculated letter, Defendant SMELAND admitted that Plaintiffs were essentially being terminated "because there was now nothing more to discuss regarding severance , and because your separation has been delayed for this purpose only, your continued employment has become untenable." This statement was not only false, but was a willful misrepresentation of what had transpired between the Plaintiffs and GSSC, and was intended to create a pre-text for the actual wrongful terminations which were being committed against Plaintiffs.

139.    Clear that none of the Plaintiffs ever made a "request for separation" as stated by Defendant SMELAND in her June 22, 2021 letter, Plaintiffs wrote to Defendant SMELAND and reiterated that fact that they had were not seeking separation and in fact had not interest in doing so.

140.    An example of the immediate response to the termination letters was an electronic mail sent by Plaintiff Thomas Flanagan, he wrote in part:

> I write in response to your letter of yesterday, June 21, 2021, summarily terminating me from my employment with the Girl Scouts of Suffolk County after more than 22 years of dedicated service. I was shocked to receive your letter as there was no warning for this act of further retaliation. Kindly know that I contest this termination and did not seek to be terminated and do not agree with any claim that I was seeking to leave.

> I reject your attempt to suggest that I asked for this and refuse to waive any of my rights in any fashion, no less you thinking that you providing a small severance check, grossly out of proportion with the agency's own precedent, addresses this act of abuse and violation of rights.

In fact, after I, along with my four other colleagues blew the whistle on mis-management; abuses of staff; financial concerns; withholding of information; fraudulent representations and other abuses by the new President & CEO, who you and the Board hired, I expected to be treated with a level of caring and respect. This was the least I expected, and it should have come following the efforts taken to save this organization.

Instead, you and the Board have acted in an abusive and retaliatory way to violate me and my rights that have caused me great harm on many levels. I demand that I be immediately fully reinstated. In the last correspondence from my attorneys you and your lawyer were fully apprised that I, along with my other four colleagues, who have all served the Girl Scouts well, were not seeking to separate.

Your attempt to ignore that fact and many others will serve to be the cause of great harm to an institution that we all thought was worth speaking up for. If I am not reinstated immediately, I will advise my attorney to take all necessary steps and pursue those avenues that will vindicate me and protect my rights.

141. Rather than Respond to the Plaintiffs, Defendant SMELAND forwarded their emails to Jeffrey M. Schlossberg, Esq. who responded by letter dated June 25, 2021 to Plaintiffs' Counsel which stated in part that, "...the Girl Scouts is not revoking its terminations of their employment. Unfortunately, in your last email dated May 27, you declined to continue negotiations by refusing to respond to the Council's most recent proposal, stating, 'We thank you for your time.' However, if you wish to discuss reasonable terms of an amicable resolution, please let us know (although any prior offers that were made for settlement purposes without prejudice are hereby revoked)."

142. Plain and simple, Plaintiffs who made it clear that they were whistle blowers, were subjected to the adverse employment action of terminated because they decided not to discuss settlement and instead decided to "**continue their roles as loyal and dedicated employees maintaining the highest professional standards, as they have done all along.**"

143. In a serious of further retaliatory adverse actions, Plaintiffs' benefits were terminated on June 30, 2021 despite Plaintiffs' letter of termination from Defendants indicating that all benefits

would remain in effect and last through July 31, 2021.

144. Additionally, on June 22, 2021 and in further retaliation, GSSC prevented Plaintiffs from accessing their Flexible Spending Accounts (FSA) and Health Savings Accounts (HSA) accounts. Even though Plaintiff's funded these accounts themselves, GSSC locked Plaintiffs out of their own accounts and the account funds were subsequently wrongfully taken by GSSC.

145. While all Plaintiff's benefits were immediately severed, this was contrary to past practice as it has been the practice of GSSC to extend medical benefits for separated employees. As an example, FORMER CEO MASTROTA's, the focus of the wrongful acts being committed against GSSC, medical benefits were extended an additional two and one half (2 ½) months after her resignation.

146. GSSC failed to pay Plaintiffs their complete salaries for the pay cycle in which Plaintiffs were terminated, despite a pattern and practice of paying separated employees for the full ten (10) day pay cycle in which they worked when terminated. This act was done as an further act of retaliation and in violation of New York State Wage Theft Protection Act.

147. GSSC denied payment of Plaintiffs' accrued sick time, personal time and other benefits, despite GSSC's pattern and practice of paying other separated employees for their accrued time. These denials of payments to Plaintiff's which are contrary to GSSC's history of treating people no longer employed is nothing more than further instances of retaliation.

148. In fact, GSSC's history is to pay out former employees at rates significantly higher than the rates indicated in the GSSC Handbook. Yet, Plaintiffs received no payment whatsoever.

149. In a further act of mistreatment and retaliation, Defendants failed to pay Plaintiffs' 403b contributions for time periods ranging from two (2) weeks to more than one (1) month

following termination. For over twenty (20) years, GSSC paid 403b contributions on the same day as wage payments, thus setting the standard of when contributions "can be reasonably segregated from the company's general assets," as mandated by the Department of Labor (DOL).

150.    Further, GSSC failed to notify Plaintiffs of their pension servicing company within the required 45 days following their termination.  This delay denied Plaintiff's the opportunity to claim benefits and significantly delayed payment of these benefits. Additionally, GSSC misidentified the pension company as Mercer, which has not serviced the GSSC pension since December of 2020.

151.    Defendants have denied Plaintiffs access to retrieve digital assets and property, including intellectual property, HIPPA protected medical information and other privileged correspondence covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521.

152.    Other separated employees were permitted access to their former computers in order retrieve personal information. Further, Plaintiffs' work computers were physically removed from their former offices, an action which was not done to any other separated employee.

153.    The Defendants have falsely accused Plaintiff Whistleblowers, in a letter dated July 21, 2021, of deleting agency material that GSSC already had in its possession. That letter was defamatory, libelous, abusive, and intended to do Plaintiffs harm, as that letter was also shared with, at the very least, the EXECUTIVE COMMITTEE of the BOARD OF DIRECTORS of GSSC.

154.    Further, Defendants, in an act of hostility, ordered there be a security guard on site whenever Plaintiff Whistleblowers returned property.  These actions were demeaning and devalued Plaintiffs' years of service. In the past 20 years, Plaintiffs can only recall one instance when a security guard was ordered to be on site when a former employee returned.  In stark contrast to Plaintiffs, that instance involved a former employee who had threatened numerous staff members

with bodily harm.

155.    Defendants have contested Plaintiffs' Unemployment Claims stating falsely that Plaintiffs resigned. This forced Plaintiffs KYLE GRANT and THOMAS FLANAGAN have to fight for their unemployment benefits which were eventually granted, however the treatment by GSSC and the other Defendants caused these Plaintiffs great distress and emotional upset as well as financial concern.

156.    The Department of Labor (DOL) rejected GSSC's position on their the denial of benefits to Plaintiffs KYLE GRANT and THOMAS FLANAGAN and made same clear in a conversation with Plaintiff FLANAGAN on a November 16, 2021. The DOL rejected GSSC's position, which was that this situation was no different than an employee giving a two-week notice and GSSC telling them to leave immediately. The DOL said that the intent to stay is the issue and that Plaintiffs intent was to stay. The DOL stated that "looking for a reasonable separation is not quitting." The DOL also said that GSSC violated NYS law by not providing a signed "final incident for discharge."

157.    Defendants have also cancelled cell phone service without warning despite Plaintiffs' multiple and documented attempts to have the phone numbers transferred in the same manner as done with other separated employees. These phone numbers were tied to nearly all aspects of Plaintiffs' lives, including doctors, credit cards and the Social Security Administration. Without access to multi-factor identification (MFA), Plaintiffs were unable to access key life services.

158.    Defendants refused Plaintiffs' request to purchase the phones, which is a well documented option that has consistently been approved for previously separated employees.

159.	Defendants refused Plaintiffs' request to remove the Apple Identifications from Plaintiffs' former work computers. This denial occurred despite the multiple warnings of possible identity theft and security risks and the knowledge that Apple ID allows access to all passwords, credit card information, privileged messages, and Multi-Factor Identification. Despite Plaintiffs' pleas it took 24 days to have the Apple Identifications removed. Other separated employees had the Apple Identifications removed immediately upon termination.

160.	Defendants failed to immediately cancel the GSSC credit card in THOMAS FLANAGAN'S name upon termination as had been done for all other separated employees. Following termination, the GSSC credit card remained linked to the Plaintiffs' Social Security Number, the credit card statement was mailed to Plaintiffs' home address, and Plaintiff would have been responsible had GSSC failed to pay the bill. For more than 90 days, Plaintiff's personal information, credit rating and identity remained in use by Defendants and at risk, yet GSSC failed to respond to multiple requests to sever Mr. FLANAGAN from the GSSC credit card.

161.	This Complaint is filed in light of the adverse employment actions taken to impact effect and alter the terms and conditions of Plaintiffs' employment, including but not limited to termination. The actions of Defendants GSSC, MASTROTA, SEVERINO, SMELAND and the Executive Board and each one of them included unresponsiveness, insensitivity, and continued retaliation, violation of the laws mentioned referenced below, violation of the policy and mandates of the rules of the GSSC and a disregard for the well being and loyalty to the GSSC to which Plaintiffs have been, and continue to be, subjected since reporting their employment experiences and observations of unethical behavior beginning July 20, 2020.

162. The wrongful treatment to which Plaintiffs have been subjected and the harm caused by that treatment is on going.

163. Based on the forgoing facts, Defendants through their actions led Plaintiffs to believe that Defendants were and/or have engaged in violations of rules, regulations, codes, statutes, laws and standards which include but are not limited to:

- The Girl Scouts of Suffolk County Handbook;
- New York State Not for Profit Corporation Law;
- National Labor Relations Act;
- Penal Law Article 155;
- Penal Law §175.05;
- Penal Law § 175.10;
- Penal Law §175.35;
- Brookhaven Town Code;
- New York State Wage Theft Protection Act

## AS AND FOR A FIRST COUNT
## NATIONAL LABOR RELATIONS ACT

164. Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 163 inclusive of this Complaint, with the same force and effect as though fully set forth herein.

165. Defendants, through their agents and employees, engaged in unfair labor practices when it negligently, wantonly, recklessly, intentionally and knowingly sought to and did wrongfully deprive Plaintiffs of their appropriate employment positions, titles and pay, before ultimately terminating Plaintiffs in retaliation for engaging in protected, concerted activity.

166. Plaintiffs are and continue to be qualified for each and every position held prior to demotion and prior to termination. Plaintiffs are the victims of retaliation and other unfair labor practices based upon their whistleblower complaints consistently made since at least June of 2020.

167. Plaintiffs engaged in a concerted effort to remedy the violations of high business and personal ethical standards and violations of applicable laws, as outlined and in accordance with, the GIRL SCOUTS OF SUFFOLK COUNTY HANDBOOKS policies and procedures. However, Plaintiffs were denied resolution of the issues brought before Defendants in an effort to better the GIRL SCOUTS OF SUFFOLK COUNTY, and instead were punished for engaging in a protected and lawful activity including complaining about unethical, unlawful and improper actions, and then engaging in good faith negotiations with GSSC and then ultimately being terminated.

168. The act of Defendants GSSC, MASTROTA, SEVERINO, SMELAND and Executive Board of repeatedly singling out, treating Plaintiffs differently than other employees and ultimately terminating them while the entire staff and BOARD of GSSC is aware that Plaintiffs have served productively in their respective positions for almost 100 years combined is beyond humiliating.

169. Plaintiffs have been subjected to differential treatment by Defendants GSSC, MASTROTA, SEVERINO, SMELAND and Executive Board based on their collective participation in a protected activity and continue to be the victims of retaliation for their opposition to the unethical business practices of GSSC and the wrongful treatment of themselves and other employees of GSSC, including management and non-management staff.

170. As a direct result of said acts, Plaintiffs have suffered and continue to suffer loss of income. Plaintiffs suffered loss of other employment benefits and continue to suffer distress, humiliation, embarrassment as a result of the differential and discriminatory treatment and hostile work environment.

171. As a direct result of the aforementioned acts, Plaintiffs have been deprived of their rights, deprived of their life-long careers, physically and mentally harmed. Plaintiffs have been

forced to seek redress in the courts as a result of the previously mentioned abuses, harassment, and unfair labor practices.

172. Plaintiffs have been subjected to humiliation, ignominy, loss of title/status, untimely removal from their positions, and unwarranted termination to their careers. As a result, Plaintiffs have suffered a severe diminution in their quality of life.

173. Plaintiffs have been denied status, property, benefits, resources and trust awarded to other employees and former employees who were similarly situated, excepting the fact that Plaintiffs dared to expose the prevalent corruption, deceit, and unethical behavior occurring within GSSC. Were Plaintiffs to just go along with the status quo, rather than organize as Whistleblowers, they would not have been subjected to the adverse employment actions, termination, and adverse post employment actions to which Plaintiffs continue to be subjected. Nor would Plaintiffs continue to face the intense abuse and humiliation.

174. Plaintiff has incurred incidental fees/damages, loss of pay, loss of benefits, loss of income and other damages/ injuries due to Defendants' unlawful labor practices.

175. As a direct result of said acts, Plaintiffs have suffered, and continue to suffer, loss of income, loss of wages, loss of benefits, loss of retirement benefits, loss of longevity, loss of status, loss of opportunities, distress, humiliation, embarrassment, emotional trauma, and damage to their reputations as alleged in the preceding paragraphs of the within Complaint.

176. That by reason of the foregoing, collective Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages, have been subjected to economic losses and emotional injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged

42

in excess of five million ($5,000,000) dollars per Plaintiff, as well as costs and attorney's fees.

## AS AND FOR A SECOND COUNT
## DEFENDANTS ARE IN VIOLATION OF
## NEW YORK LABOR LAW §215

177.    Plaintiffs repeat and reiterate the allegations set forth in paragraphs 1 through 176

inclusive of this *Complaint*, with the same force and effect as though herein fully set forth.

178.    Plaintiffs were discharged, threatened, penalized, discriminated and retaliated against

by Defendants because Plaintiffs complained of the unethical behavior of Defendants in violation

of New York Labor Law §215.

179.    No later than June 8, 2020, Plaintiffs complained to Defendants GSSC, MASTROTA,

SEVERINO, SMELAND and Executive Board, alerting the staff, officers, directors and agents of

the corporation of Plaintiffs' concerns for the well being of GSSC and of the individual sufferings

of Plaintiffs.  Plaintiffs acknowledged in their complaints to Defendants that they spoke not only for

themselves, but for other employees who were too afraid to come forward and complain as they

witnessed what was happening to Plaintiffs and their fear of retaliation.

180.    New York Labor Law §215 states in pertinent part:

> "1. (a) No employer or his or her agent, or the officer or agent of any
> corporation, partnership, or limited liability company, or any other person,
> shall discharge, threaten, penalize, or in any other manner discriminate or
> retaliate against any employee (I) because such employee has made a
> complaint to his or her employer, or to the commissioner or his or her
> authorized representative, or to the attorney general or any other person, that
> the employer has engaged in conduct that the employee, reasonably and in
> good faith, believes violates any provision of this chapter, or any order
> issued by the commissioner (ii) because such employer or person believes
> that such employee has made a complaint to his or her employer, or to the
> commissioner or his or her authorized representative, or to the attorney
> general, or to any other person that the employer has violated any provision
> of this chapter, or any order issued by the commissioner..."

43

181.    Plaintiffs' Complaints as to the improper and unethical behavior of GSSC, led by former CEO Mastrota and supported by the GSSC, SEVERINO, SMELAND and Executive Board EXECUTIVE BOARD was based on Plaintiffs' personal experiences, personal knowledge, and their reasonable belief that their complaints were of violations of the rules and regulations of the GSSC handbook, State and Federal laws and Human Rights Laws.

182.    Here, following Plaintiffs internal complaint on behalf of themselves, other employees and the Girl Scouts of Suffolk County as a whole, of unethical, illegal, discriminatory practices, Plaintiffs have been harmed and violated even after their termination by GSSC.

183.    That by reason of the foregoing, collective Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages, have been subjected to economic losses and emotional injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess of five million ($5,000,000) dollars per plaintiff, as well as costs and attorney's fees.

### AS AND FOR A THIRD COUNT
### NEW YORK'S NOT-FOR-PROFIT-CORPORATION LAW §715-b

184.    Plaintiffs repeat and reiterate the allegations set forth in paragraphs 1 through 183 inclusive of this Complaint, with the same force and effect as though herein fully set forth.

185.    Plaintiffs' as private citizens are entitled to Whistleblower protection pursuant to Not-for-Profit-Corporation Law §715-b.

186.    On, June 8, 2020 and continuing, Plaintiffs provided Defendants GSSC, MASTROTA, SEVERINO, SMELAND and Executive Board with information through documents and testimony describing violations to the GSSC handbook, possible violations of State and Federal

Law and discriminatory practices.

187.    Plaintiffs' Complaints as to the improper and unethical behavior of GSSC, led by former CEO Mastrota and supported by the BOARD was based on Plaintiffs' personal experiences, personal knowledge, and their reasonable belief that their complaints were of violations of the rules and regulations of the GSSC handbook, State and Federal laws and Human Rights Laws.

188.    New York's Not-For-Profit Corporation Law §715-b was instituted as:

> a whistleblower policy to protect from retaliation persons who report suspected improper conduct.  Such policy shall provide that no director, officer, employee or volunteer of a corporation who in good faith reports any action or suspected action taken by or within the corporation that is illegal, fraudulent or in violation of any adopted policy of the corporation shall suffer intimidation, harassment, discrimination or other retaliation or, in the case of employees, adverse employment consequence. §715-b

189.    Here, Defendants GSSC, MASTROTA, SEVERINO, SMELAND and Executive Board have completely ignored and violated these protections as Plaintiffs have suffered and continue to suffer through each affliction the statute was designed to protect. Plaintiffs have been and continue to be intimidated, harassed, discriminated against and suffered adverse employment action including termination, delay and denial of benefits, humiliation and others.

190.    That by reason of the foregoing, collective Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages, have been subjected to economic losses and emotional injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess of five million ($5,000,000) dollars per plaintiff, as well as costs and attorney's fees.

## AS AND FOR A FOURTH COUNT
## DEFENDANTS ARE LIABLE TO PLAINTIFFS
## PURSUANT TO NEW YORK NOT-FOR-PROFIT CORPORATION LAW §720-a

191.    Plaintiffs repeat and reiterate the allegations set forth in paragraphs 1 through 190 inclusive of this Complaint, with the same force and effect as though herein fully set forth.

192.    Defendants GSSC, MASTROTA, SEVERINO, SMELAND, GORDON, LOTT, MCCANDLESS, SCOTT AND FRIEDMAN were Directors, officers, or trustees of a corporation as described in §501(c)(3) of the Internal Revenue Code.

193.    Defendants GSSC, MASTROTA, SEVERINO, SMELAND and Executive Board intended to cause and did cause harm to Plaintiffs through their outright and unethical behavior, their sanctioning of the abovementioned unethical behavior and the retaliatory termination of Plaintiffs due to Plaintiffs' Whistleblowing activities.

194.    Defendants GSSC, MASTROTA, SEVERINO, SMELAND and Executive Board actions of gross negligence caused great harm in their sanctioning of the abovementioned unethical behavior and the retaliatory termination of Plaintiffs due to Plaintiffs' Whistleblowing activities.

195.    New York's Not-For-Profit Corporation Law §720-a provides:

> "Except as provided in sections seven hundred nineteen and seven hundred twenty of this chapter, and except any action or proceeding brought by the attorney general or, in the case of a charitable trust, an action or proceeding against a trustee brought by a beneficiary of such trust, no person serving without compensation as a director, officer or trustee of a corporation, association, organization or trust described in section 501 (c)(3) of the United States internal revenue code shall be liable to any person other than such corporation, association, organization or trust based solely on his or her conduct in the execution of such office *unless the conduct of such director, officer or trustee with respect to the person asserting liability constituted gross negligence or was intended to cause the resulting harm to the person asserting such liability.* For purposes of this section, such a director, officer or trustee shall not be considered compensated solely by reason of payment of his or her actual expenses incurred in attending meetings or otherwise in the execution of such office." (Emphasis added.)

196. Here, Defendants GSSC, MASTROTA, SEVERINO, SMELAND and Executive Board engaged in retaliation which has caused Plaintiffs to suffer through the deprivation of appropriate employment positions, titles and pay before ultimately being terminated on June 22, 2021 and continuing.

197. Defendants GSSC, MASTROTA, SEVERINO, SMELAND and Executive Board were made aware of Plaintiffs grievances no later than June 8, 2020 when Plaintiffs informed Defendants by letter.

198. GSSC, MASTROTA, SEVERINO, SMELAND and Executive Board as directors, officers and board members, Defendants were responsible for the financial ethics of GSSC, the treatment suffered by Plaintiffs and ultimately the retaliatory termination Plaintiffs who successfully led GSSC for nearly 100 combined years.

199. That by reason of the foregoing, collective Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages, have been subjected to economic losses and emotional injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess of five million ($5,000,000) dollars per Plaintiff, as well as costs and attorney's fees.

## AS AND FOR A FIFTH COUNT
## 42 U.S.C. §1981

200. Plaintiffs repeat and reiterate the allegations set forth in paragraphs 1 through 199 inclusive of this Complaint, with the same force and effect as though herein fully set forth.

201. The above discriminatory acts based on Plaintiff KYLE GRANT'S race and color, and retaliation for opposing discriminatory practices by Defendants GSSC, MASTROTA and BROWN violates 42 U.S.C. § 1981.

202. On or about May 20, 2020, during a meeting with Mr. FLANAGAN and Director of Human Resources, Ildalisa Diaz, Ms. MASTROTA repeatedly warned Plaintiff FLANAGAN and Ms. Diaz to be careful, with Mr. GRANT because he could get angry and destroy GSSC property including its computer systems infrastructure. This statement was not based on any history or good faith. The former CEO also continued to allege that MR. GRANT was not present at the agency. Not only was this an attack on Mr. GRANT using the racial stereotype that staff should be fearful of an *angry Blackman*, MASTROTA also continued the same negative racial stereotype of the slacker Black worker she used when describing Mr. GRANT'S mother, former CEO Yvonne Grant.

203. Plaintiff GRANT has been discriminated against, due to his race and color in violation of 42 U.S.C. § 1981 and Plaintiff GRANT has been subjected to discrimination due to his race and color in that he was forced to work in an extremely hostile environment, was subjected to micro-aggressions and demeaned by DEFENDANTS MASTROTA and BROWN. Plaintiff GRANT was stripped of title, demoted, suffered loss of pay, was set up by DEFENDANTS MASTROTA and BROWN in an attempt to manufacture a basis to discipline and terminate him.

204. At all times relevant to this Complaint PLAINTIFF GRANT was qualified for his position and treated as though he was not due his race and color.

205. Defendants GSSC, MASTROTA and BROWN deliberately discriminated against Plaintiff GRANT by allowing DEFENDANTS MASTROTA, BROWN and eventually SMELAND to harass, retaliate, and discriminate against Plaintiff GRANT based upon race and color and/or opposition to the discriminatory acts.

206. Plaintiffs FLANAGAN and THOMPSON were treated differently and retaliated against because of their speaking up on behalf of Plaintiff Grant and in opposition of his

mistreatment by GSSC, MASTROTA and BROWN due to his race and color.

207.    That by reason of the foregoing, collective Plaintiffs GRANT, FLANAGAN and THOMPSON are now suffering and will continue to suffer irreparable injury and monetary damages, have been subjected to economic losses and emotional injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess of five million ($5,000,000) dollars per Plaintiff, as well as costs and attorney's fees.

### AS AND FOR A SIXTH COUNT
### §296 OF THE HUMAN RIGHTS LAW

208.    Plaintiffs repeat and reiterate the allegations set forth in paragraphs 1 through 207 inclusive of this Complaint, with the same force and effect as though herein fully set forth.

209..    The above discriminatory acts based on Plaintiff KYLE GRANT'S race and color, and retaliation for opposing discriminatory practices by Defendants GSSC, MASTROTA and BROWN violates §296 of the New York State Executive Law, otherwise referred to as the Human Rights Law.

210.    On or about May 20, 2020, during a meeting with Mr. FLANAGAN and Director of Human Resources, Ildalisa Diaz, Ms. MASTROTA repeatedly warned Plaintiff FLANAGAN and Ms. Diaz to be careful, with Mr. GRANT because he could get angry and destroy GSSC property including its computer systems infrastructure. This statement was not based on any history or good faith. The former CEO also continued to allege that MR. GRANT was not present at the agency. Not only was this an attack on Mr. GRANT using the racial stereotype that staff should be fearful of an *angry Blackman*, MASTROTA also continued the same negative racial stereotype of the slacker Black worker she used when describing Mr. GRANT'S mother, former CEO Yvonne Grant.

211.    Plaintiff GRANT has been discriminated against, due to his race and color in violation of §296 of the Human Rights Law and Plaintiff GRANT has been subjected to discrimination due to his race and color in that he was forced to work in an extremely hostile environment, was subjected to micro-aggressions and demeaned by DEFENDANTS MASTROTA and BROWN. Plaintiff GRANT was stripped of title, demoted, suffered loss of pay, was set up by DEFENDANTS MASTROTA and BROWN in an attempt to manufacture a basis to discipline and terminate him.

212.    At all times relevant to this Complaint PLAINTIFF GRANT was qualified for his position and treated as though he was not due his race and color.

213.    Defendants GSSC, MASTROTA and BROWN deliberately discriminated against Plaintiff GRANT by allowing DEFENDANTS MASTROTA, BROWN and eventually SMELAND to harass, retaliate, and discriminate against Plaintiff GRANT based upon race and color and/or opposition to the discriminatory acts.

214.    Defendants then further discriminated retaliated against Plaintiff GRANT by causing him to be terminated, denying him benefits that he had earned and preventing him from access to the same right, conditions and opportunities as White employees based upon his race and color and/or opposition to the discriminatory acts.

215.    Plaintiffs FLANAGAN and THOMPSON were treated differently and retaliated against because of their speaking up on behalf of Plaintiff Grant and in opposition of his mistreatment by GSSC, MASTROTA and BROWN due to his race and color.

216.    That by reason of the foregoing, collective Plaintiffs GRANT, FLANAGAN and THOMPSON are now suffering and will continue to suffer irreparable injury and monetary damages, have been subjected to economic losses and emotional injury, distress, pain, suffering, loss of self-

esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess of five million ($5,000,000) dollars per Plaintiff, as well as costs and attorney's fees.

## AS AND FOR A SEVENTH COUNT
## NEW YORK'S LABOR LAW §198- NEW YORK STATE
## WAGE THEFT PROTECTION ACT

217. Plaintiffs repeat and reiterate the allegations set forth in paragraphs 1 through 216 inclusive of this Complaint, with the same force and effect as though herein fully set forth.

218. Plaintiffs' as employees are entitled to Whistleblower and wage protection pursuant to New York State Wage Theft Protection Act.

219. GSSC failed to pay Plaintiffs their complete salaries for the pay cycle in which Plaintiffs were terminated, despite a pattern and practice of paying separated employees for the full ten (10) day pay cycle in which they worked when terminated. This act was done as an further act of retaliation and in violation of New York State Wage Theft Protection Act.

220. On, June 8, 2020 and continuing, Plaintiffs provided Defendants GSSC, MASTROTA, SEVERINO, SMELAND and Executive Board with information through documents and testimony describing violations to the GSSC handbook, possible violations of State and Federal Law and retaliatory practices including the withholding, lessening and diminishing of pay and benefits.

221. Plaintiffs' Complaints as to the improper and unethical behavior of GSSC, led by former CEO Mastrota and supported by the BOARD was based on Plaintiffs' personal experiences, personal knowledge, and their reasonable belief that their complaints were of violations of the rules

and regulations of the GSSC handbook, State and Federal laws and Labor Laws.

222.     Here, Defendants GSSC, SEVERINO, SMELAND and Executive Board have completely ignored and violated these protections as Plaintiffs have suffered and continue to suffer through each affliction the statute was designed to protect. Plaintiffs have been and continue to be intimidated, harassed, discriminated against and suffered adverse employment action including termination, delay and denial of benefits, humiliation and others.

223.     That by reason of the foregoing, collective Plaintiffs suffered, are now suffering and will continue to suffer irreparable injury and monetary damages, have been subjected to economic losses and emotional injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess of five million ($5,000,000) dollars per Plaintiff, as well as costs and attorney's fees.

## **PRAYER FOR RELIEF**

Wherefore, based on the foregoing, Plaintiffs request judgment as follows:

a.     First Count: in excess of five million ($5,000,000) dollars per plaintiff as well as other damages, costs and attorney's fees.

b.     Second Count: in excess of five million ($5,000,000) dollars per plaintiff as well as other damages, costs and attorney's fees.

c.     Third Count: in excess of five million ($5,000,000) dollars per plaintiff as well as punitive damages, costs and attorney's fees.

d.     Fourth Count: in excess of five million ($5,000,000) dollars per plaintiff as well as other damages, costs and attorney's fees.

e.     Fifth Count: in excess of five million ($5,000,000) dollars per plaintiff as well as punitive damages, costs and attorney's fees.

f.     Sixth Count: in excess of five million ($5,000,000) dollars per plaintiff as well as punitive damages, costs and attorney's fees.

g.    Seventh Count: in excess of five million ($5,000,000) dollars per plaintiff as well as punitive damages, costs and attorney's fees.

h.    Attorney's fees and costs, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 2000e-5(k) and other fee and costs statutes;

I.    A declaratory judgment stating that Defendants wilfully violated Plaintiff's rights secured by federal and state laws as alleged herein;

j.    Injunctive relief: an injunction requiring Defendants to correct all present and past violations of federal and state law as alleged herein; to enjoin the Defendants from continuing to act in violation of federal and state law as alleged herein; and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal and state laws; and

k.    An Order granting such other legal and equitable relief as the court deems just and proper.

## PLAINTIFFS DEMAND A TRIAL BY JURY

Dated:  Hempstead, New York
        December 28, 2021

                                LAW OFFICES OF
                                FREDERICK K. BREWINGTON

                        By:   _____
                                FREDERICK K. BREWINGTON
                                *Attorneys for Plaintiffs*
                                556 Peninsula Boulevard
                                Hempstead, New York  11550
                                (516) 489-6959